In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3127

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES F. GREVE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 05 CR 50031—**Philip G. Reinhard**, *Judge.*

ARGUED APRIL 13, 2007—DECIDED JUNE 4, 2007

Before FLAUM, MANION, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* A grand jury indicted James Greve on four counts of income tax offenses all in violation of 26 U.S.C. § 7206(1). Greve filed a motion to dismiss the indictment and/or suppress evidence, alleging that the Internal Revenue Service ("IRS") violated his Fourth and Fifth Amendment rights by conducting a covert criminal investigation under the guise of a civil audit. The district court denied Greve's motion, stating that the facts reflected a "typical IRS civil investigation that ultimately led to a criminal referral." Greve appeals. For the following reasons, we affirm the district court's judgment.

## I. BACKGROUND

James Greve took over Greve Construction, the family business, in 1990 and converted it into a commercial snow plowing company for shopping centers, school districts, and other municipal entities. Until early 2000, Greve operated his business without an accountant and kept track of business income and expenses through billing invoices and expense receipts. Through 1999, Greve prepared his own federal and state income tax returns, employing a hybrid cash and accrual method of reporting income.

On June 28, 1999, the IRS began a civil audit of Greve's 1997 federal income tax return. Greve contacted revenue agent Ramona Luke and scheduled a meeting for August 5, 1999; however, Greve missed the scheduled appointment. On August 5, 1999, Luke issued Greve an examination report and proposed to add $143,023 in additional income to his 1997 taxable income and assessed an additional $68,383 in taxes, interest and penalties. On September 2, 1999, Greve and Luke met, and Greve admitted that he had omitted $107,888 of income in 1997. Luke determined that Greve kept inadequate books and records and employed unacceptable accounting procedures. Additionally, Greve told Luke that he and his wife had recently hired an accountant to prepare their future income tax returns.

Immediately following the September 2, 1999 interview, Luke mailed Greve an IRS Information Document Request ("IDR") seeking bank records that would reflect unreported gross receipts. On September 24, 1999, Greve turned over the requested bank deposit records.

On January 13, 2000, Luke began reviewing her file on Greve. On January 31, 2000, Luke reviewed the documents that Greve gave her and noted that some of the documents appeared to have been altered and that she did not have

all of Greve's account information. On February 1, 2000, Luke noted that she needed to discuss the case with her group manager, Margaret Songer, and that Greve's case potentially involved fraud as opposed to merely an understatement of income.

On March 9, 2000, Luke met with Songer, who agreed that the case "may have fraud potential." Songer set up a meeting between Luke and the IRS District Fraud Coordinator, Michael Welu. The Fraud Coordinator helps develop potential fraud cases and instructs revenue agents and tax auditors how to investigate cases that may involve civil fraud or result in a criminal referral to the IRS Criminal Investigation Division ("CID").

On March 28, 2000, Welu and Luke met for seven hours about the Greve audit. During that meeting, Welu suggested that Luke expand the audit to include the 1998 tax year, obtain the 1996 tax year returns, and confirm whether Greve altered the documents he gave Luke. Welu directed Luke to issue administrative summonses to Greve's banks because they could assist in determining whether Greve had any hidden accounts.

On March 29, 2000, Luke contacted Greve and requested additional documents and another interview. She also advised Greve that she would be issuing him an IDR for tax years 1997 and 1998. During that conversation, Greve told Luke that he only reported income from customers who did not issue him an IRS Form 1099 and claimed that he did this because the IRS already knew about the income reported on the 1099 forms. After the conversation ended, Luke wrote a note reminding herself to determine whether Greve had altered the documents he previously provided.

On March 30, 2000, Welu informed Luke that Greve had been involved in several large cash transactions, possessed a previously undisclosed bank account, and had transferred his home into a trust shortly after the IRS audit

began. Luke faxed Welu her proposed IDR for the 1997-1998 tax years for his review and approval. On April 4, 2000, Luke spent six hours reviewing Greve's file. She prepared an Examination Request for tax year 1998, seeking permission to expand the audit to include that year. The stated reasons for the request were "recurring issue" and "develope [sic] for fraud." Luke also prepared a request for tax year 1996 for "info only."

On April 6, 2000, Luke gave Greve the IDR she prepared with Welu for the 1997-1998 tax years and faxed Songer the previously prepared examination request. Luke also told Songer that she still had "to develop the fraud case" against Greve. On April 19, 2000, Luke prepared administrative summonses and retrieved IRS information on Greve's 1996 and 1998 tax returns.

On May 5, 2000, Greve requested additional time to produce his records. He told Luke that he was overwhelmed by the number of documents she requested and did not know how to organize them. Luke told Greve how to organize the records and gave him more time to gather them. On May 8, 2000, Greve called Luke to tell her that he had retained an attorney, Christopher Saternus. Saternus requested more time to gather Greve's documents. On June 15, 2000, Luke noted that she could not proceed with the audit until she received the requested documents from Greve, so she called Saternus and told him that she needed the documents to proceed with her examination.

On July 10, 2000, Greve called Luke to discuss the document request. He informed her that he had requested his customers' cancelled checks from his bank but did not have all of them. Luke told Greve that the records were due by July 20, 2000.

On July 20, 2000, Luke met with Saternus and Greve. Saternus asked whether Luke would be able to wrap up

the audit for the years in question after she received the requested documents. Luke responded that there would be additional taxes, interest, and penalties and that the audit would be "wrapped up pretty quickly" after their meeting upon final review and determination. Greve and Saternus gave Luke all of the requested documents and acknowledged that Greve had understated his income in 1997 and 1998 by approximately $245,000.

Between July 20, 2000 and October 17, 2000, Luke continued her review of Greve's records. On October 2, 2000, Luke advised Songer that she had completed the majority of the work involved in determining the gross receipts but that she had learned of a new bank account in Greve's wife's name. The following day, Greve called Luke and inquired about the audit's status. Luke told Greve that she needed the documents on the newly-discovered bank account and that she might ask Greve for an extension of the civil statute of limitations.

On January 23, 2001, after discussing the audit with Welu, Luke downloaded the IRS fraud handbook. Luke's notes from the following day indicate that she needed to conclude the audit and either "write up referral or close agreed." On January 25, 2000, Luke noted that she needed to set an appointment with Welu to complete the referral of the criminal fraud case. The next day, Luke scheduled a meeting with Welu to "write fraud referral." On February 15, 2001, Luke and Welu met to discuss the status of the audit. Welu told Luke that she could not refer the matter to CID because she needed to be able to show that Greve made an "overt action." Welu instructed Luke to contact Greve's customers to determine why they did not issue him 1099 forms for work he performed for them. Welu and Luke also discussed the applicable statute of limitations for civil assessment. Welu noted that because Greve omitted over 25% of income, the statute could be

extended. Luke contacted several of Greve's customers and requested information regarding their payments to him.

On March 23, 2001, Luke met with Welu for another six hours. Following that meeting, Luke wrote up her CID referral report, which noted that Greve filed a "W-9 with several customers claiming that he was incorporated when he was in fact not. These customers issued no 1099's [sic]." On March 26, 2001, Songer e-mailed Welu asking about the referral's status. Welu e-mailed Songer that the referral had been made. Songer then e-mailed Luke with the news, stating, "O ye of little faith." On April 2, 2001, Special Agent Mark Johnson met with Luke, Welu, and Songer to discuss the case.

On March 29, 2005, a federal grand jury indicted Greve on four income tax offenses, alleging violations of 26 U.S.C. § 7206(1). Count One charged Greve with failing to report $158,539 in gross receipts in his personal tax return for tax year 1998. Count Two charged Greve with failing to report $201,736 in gross receipts in his personal tax return for tax year 1999. Count Three charged him with failing to report $388,365 in gross receipts in a tax return for Greve Construction, Inc. for tax year 2000. Count Four charged Greve with claiming a false S corporation loss and a false refund in his personal income tax return for tax year 2000.

Greve filed a motion to dismiss the indictment and/or suppress evidence, alleging that the IRS had unconstitutionally obtained statements and documents for him by conducting a civil audit of Greve after it had "firm indications of fraud." Greve also filed a motion for leave to conduct discovery and requested an evidentiary hearing on his initial motion. On December 12, 2005, the district court, accepting as true all of the facts alleged by Greve, denied the motions, finding that the facts reflected a "typical IRS civil investigation that ultimately led to a criminal referral." Greve appeals.

## II. Discussion

### A. Motion to Dismiss the Indictment

Greve contends that the district court erred by denying his motion to dismiss the indictment because the IRS presented illegally obtained evidence to the grand jury. This Court reviews questions of law in a district court's ruling on a motion to dismiss an indictment de novo. *United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998). It reviews factual findings for clear error. *Id.* The Supreme Court has held that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . , if valid on its face, is enough to call for a trial on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). The Court's reluctance to examine the quality or sufficiency of the evidence presented to a grand jury extends even to unconstitutionally obtained evidence. *See United States v. Calandra*, 414 U.S. 338, 344-45 (1974) (stating that "an indictment valid on its face is not subject to challenge on the ground that . . . the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination"). Accordingly, even if the grand jury examined illegally obtained evidence, the district court did not err by denying Greve's motion to dismiss the indictment.

### B. Motion to Suppress

Greve next argues that the district court erred by denying his motion to suppress because the IRS obtained evidence against him in violation of his Fourth and Fifth Amendment rights by conducting a covert criminal investigation under the guise of a routine civil audit. We review questions of law in a district court's ruling on a motion to suppress de novo. *Peters*, 153 F.3d at 451. We review factual findings for clear error. *Id.*

Greve contends that Luke affirmatively misled him by continuing to conduct a civil audit after she had firm indications of fraud. *See United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983) (stating that a defendant seeking suppression must produce clear and convincing evidence that the agents affirmatively misled him as to the true nature of their investigation). Although the IRS regulations require a civil investigator to cease her investigation when she has developed firm indications of fraud, *see* Internal Revenue Manual §§ 4565.21(1), 9311.83(1), we have held that "[a] failure to terminate a civil investigation when the revenue agent has obtained firm indications of fraud does not, without more, establish the inadmissibility of evidence obtained by [the agent] in continuing to pursue the investigation." *United States v. Kontny*, 238 F.3d 815, 820 (7th Cir. 2001). Indeed, "[p]roof of deceit must be linked up to the constitutional standard of threat or promise." *Id.* at 819. In other words, Greve must prove that Luke induced his compliance through false promises.

Greve maintains that Luke made false promises to him by repeatedly advising him that his cooperation would result solely in a civil tax assessment. Greve first identifies a July 10, 2000 phone conversation, in which Greve called Luke to tell her that he was having difficulty obtaining all of the cancelled checks, and Luke told him not to worry because the records were due on July 20, 2000. Greve contends that "clearly, Luke [wa]s promising Greve that the case would be concluded if he provided his deposit records and further cooperated on July 20, 2000." We disagree. We have stated that an inappropriate promise might occur if an agent "pretend[s] to be an Assistant U.S. Attorney and assure[s] [the taxpayer that he] w[ill] not be prosecuted if [he] cooperate[s]." *Kontny*, 238 F.3d at 819. However, no such affirmative promise occurred during this conversation. Rather, it dealt solely with the timing of Greve's compliance with an IDR.

Next Greve points to the meeting on July 20, 2000 between Luke, Saternus, and Greve at the IRS's office. Saternus asked whether Luke would be able to wrap up the audit for the years in question once she received the requested documents. In response, Luke stated that upon review and final determination, there would be additional tax due, plus interest and penalties, but that it should be wrapped up following the meeting. Greve maintains that Luke's response was a promise not to refer the case to CID and to proceed in a civil manner only. Again, there was simply no such promise. In fact, Luke qualified her statement by saying that any decisions were dependant upon review and final determination. Although Luke did not inform either Saternus or Greve that she might refer the case to CID for a criminal investigation, she was not required to do so. *See Serlin*, 707 F.2d at 956 (stating that "[s]imple failure to inform the defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit"). Consequently, the district court did not err by denying Greve's motion to suppress.

## C. Evidentiary Hearing

Greve argues that the district court erred by denying his motion for an evidentiary hearing. This Court reviews a district court's denial of an evidentiary hearing for an abuse of discretion. *United States v. Juarez*, 454 F.3d 717, 719 (7th Cir. 2006). To obtain an evidentiary hearing on his motion to suppress, Greve was required to "provide sufficient information to enable the court to conclude that a substantial claim [wa]s presented and that there [we]re disputed issues of material fact which w[ould] affect the outcome of the motion." *Id.* at 720. In ruling on Greve's motion to suppress, the district court accepted Greve's factual assertions as true. Because the government did not

dispute the facts of the IRS investigation as relayed by Greve, the district court had no need to make a credibility determination. Consequently, the district court did not abuse its discretion by denying Greve's motion for a hearing.[1]

### III. CONCLUSION

For the above reasons, we AFFIRM the district court's judgment.

A true Copy:

> Teste:

> _____
> *Clerk of the United States Court of*
> *Appeals for the Seventh Circuit*

---

[1] Greve also claims that the district court erred by denying his motion for further discovery. However, because the district court properly denied Greve's motion to dismiss and motion to suppress, we need not address his challenge to the district court's denial of his motion for additional discovery. *See Larkin v. Galloway*, 266 F.3d 718, 724 (7th Cir. 2001).

---